

FILED

Jul 16 2019, 9:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Marielena Duerring
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Mark Benner, | July 16, 2019 |
| *Appellant-Defendant,* | Court of Appeals Case No. 18A-CR-2614 |
| v. | Appeal from the St. Joseph Superior Court |
| State of Indiana, | The Honorable Jeffrey L. Sanford, Judge |
| *Appellee-Plaintiff.* | Trial Court Cause No. 71D03-1511-FC-9 |

**Darden, Senior Judge.**

# Statement of the Case

Appellant Mark Benner appeals his convictions of two counts of child seduction.[1] We affirm.

# Issue

Benner presents one issue for our review, which we restate as: whether there was sufficient evidence to sustain his convictions.

# Facts and Procedural History

P.A. was born in January 1996. She knew Benner and his family through her sports activities—Benner's wife was her volleyball coach in middle school, Benner's daughter was a basketball teammate and friend, and Benner coached P.A.'s summer league basketball team the summer after her eighth grade year. During the relevant time period, Benner had been coaching for more than two decades.

From a very young age, P.A. was interested in playing basketball and was identified in the community as a very good basketball player. Even before she was old enough to be on the school team, she attempted to join their practices, and, as soon as she was old enough, she joined the fourth grade team at her school. She was often described as being "very determined," "very dedicated," "very talented," a hard worker, focused, and a "really good basketball player"

---

[1] Ind. Code § 35-42-4-7(n) (2013).

with a heightened ambition and drive greater than most of her peers. Tr. Vol. 2, pp. 89, 104, 75. P.A. looked up to her coaches and explicitly followed their guidance and instructions and was highly impressed with Benner's coaching ability.

[5] Beginning with the 2009-2010 school year, Benner served as an assistant varsity coach for the girls basketball team at Mishawaka High School. In 2010-2011, when P.A. was a freshman, she played for both the junior varsity and the varsity basketball teams and was considered an important player at the varsity level. By that time, it was common knowledge that P.A. was a very passionate and dedicated basketball player who was always seeking to improve her skills and excel in her sport. All of her coaches viewed her as an integral component of the Mishawaka High School girls basketball program, and Benner knew that her ultimate goal was to obtain a scholarship to play college basketball.

[6] With the aim of obtaining a college basketball scholarship, P.A. did extra one-on-one workouts with Benner several times a week during the summer of 2011 to improve her basketball skills. Commencing her sophomore year, P.A. made the varsity team and remained at that level throughout her high school career. Benner served as the assistant varsity basketball coach until he submitted his resignation in 2013 at the end of P.A.'s junior year. Knowing P.A.'s intense motivation to excel, Benner worked more with her and provided her with more individual attention than he did with any other player. Because of this concentrated one-on-one time together, Benner developed a closer relationship with P.A. than with other players on the team.

[7] In January 2013, concern arose at the school regarding some text messages that had been exchanged between Benner and P.A. It was later determined that the texts were basketball related, and no action was taken by the school against Benner. However, in March of 2013, at the end of the 2012-2013 basketball season, Benner resigned as assistant varsity coach. After submitting his letter of resignation, Benner drove to P.A.'s home, picked her up, and showed her his resignation letter. After P.A. read the letter, she became saddened and cried, and it was at that point that Benner kissed her. At that time, P.A. was seventeen and a junior in high school, and Benner was forty-three. Benner told P.A. that his resignation would not affect them working together to get her into college and that he would continue working with her on an individual basis.

[8] In August 2013, before P.A.'s senior year of high school, a sexual relationship began between Benner and P.A. Their sexual activities included fondling, oral sex, and sexual intercourse and continued through P.A.'s senior year. P.A. graduated from Mishawaka High School in 2014. She then attended Indiana University South Bend on a basketball scholarship. Benner's sexual relationship with P.A. continued until the spring of her freshman year of college. Their relationship ended when, in March 2015, Benner accidentally sent to his daughter a text message intended for P.A. It was only then that Benner's wife and P.A.'s parents learned of their intimate relationship.

[9] Once the relationship became known, an investigation was conducted, and, on November 20, 2015, the State charged Benner with two counts of child seduction, one as a Class D felony and one as a Class C felony. Benner filed a

motion to dismiss both charges on February 23, 2016, claiming that to convict him of child seduction as charged would violate both the federal and state prohibitions against ex post facto laws. On April 25, 2016, Benner filed a supplemental motion to dismiss, alleging as an alternative ground for dismissal that the section of the child seduction statute under which he was charged is unconstitutionally vague. The State filed responses in opposition, and, following a hearing, the trial court denied Benner's motions.

[10] On June 9, 2016, Benner filed a motion to certify the trial court's order for interlocutory appeal. The trial court granted the motion, and the Indiana Court of Appeals accepted jurisdiction over the appeal. Determining that there is no ex post facto violation and that the child seduction statute is not unconstitutionally vague as applied to Benner, the Court issued its memorandum decision affirming the trial court's denial of Benner's motions to dismiss. *See Benner v. State*, No. 71A03-1607-CR-1609 (Ind. Ct. App. July 27, 2017), *trans. denied*.

[11] A jury trial on the charges was held August 20-21, 2018, at the conclusion of which Benner was found guilty as charged. On October 5, the court sentenced Benner to consecutive terms of eighteen months and four years, all suspended to probation. Benner now appeals his convictions.

# Discussion and Decision

[12] Benner challenges the sufficiency of the evidence supporting his convictions. When we review a challenge to the sufficiency of the evidence, we neither

reweigh the evidence nor judge the credibility of the witnesses. *Sandleben v. State*, 29 N.E.3d 126, 131 (Ind. Ct. App. 2015), *trans. denied*. Instead, we consider only the evidence most favorable to the verdict and any reasonable inferences drawn therefrom. *Id.* If there is substantial evidence of probative value from which a reasonable fact-finder could have found the defendant guilty beyond a reasonable doubt, the verdict will not be disturbed. *Labarr v. State*, 36 N.E.3d 501, 502 (Ind. Ct. App. 2015). When an appellant challenges the sufficiency of the evidence of his or her convictions after a jury verdict, "the appellate posture is markedly deferential to the outcome below." *Bowman v. State*, 51 N.E.3d 1174, 1181 (Ind. 2016).

[13] Here, Benner was charged with child seduction under Indiana Code section 35-42-4-7(n), which provides:

> (n) A person who:
>
>> (1) has or had a professional relationship with a child at least sixteen (16) years of age but less than eighteen (18) years of age whom the person knows to be at least sixteen (16) years of age but less than eighteen (18) years of age;
>>
>> (2) may exert undue influence on the child because of the person's current or previous professional relationship with the child; and
>>
>> (3) uses or exerts the person's professional relationship to engage in sexual intercourse, deviate sexual conduct, or any fondling or touching with the child with the intent to

> arouse or satisfy the sexual desires of the child or the person;
>
> commits child seduction.

[14] Indiana Code section 35-42-4-7(i) additionally provides that a person has a "professional relationship," as that term is used in Section 35-42-4-7(n), with a child if:

> (1) the person:
>
>> (A) has a license issued by the state or a political subdivision on the basis of the person's training and experience that authorizes the person to carry out a particular occupation; or
>>
>> (B) is employed in a position in which counseling, supervising, instructing, or recruiting children forms a significant part of the employment; and
>
> (2) the person has a relationship with a child that is based on the person's employment or licensed status as described in subdivision (1).
>
> The term includes a relationship between a child and a mental health professional or military recruiter. The term does not include a coworker relationship between a child and a person described in subdivision (1)(B).

[15] We pause here to briefly address a footnote in Benner's brief. He points to the statutory language "is employed" in Section 35-42-4-7(i)(1)(B) and remarks that he "continues to refute the notion that when he engaged in the sexual conduct

with P.A. that this statute made such conduct illegal because he was not employed in a professional relationship" at that time. Appellant's Br. p. 8, n.2. However, this issue was decided in Benner's prior appeal where the Court determined:

> We disagree with Benner's reading of the child seduction statute. Contrary to Benner's claim, the "is employed" language of subsection (i) does not require a current professional relationship at the time the prohibited conduct occurs. Subsection (i) simply defines what constitutes a professional relationship. This determination is made by looking at the nature and circumstances of the relationship at the time the relationship existed, hence the language "is employed." It is of no moment that this definition did not exist at the time Benner was the assistant basketball coach. It is enough that as of July 1, 2013, Benner was on notice that his previous position as one of P.A.'s basketball coaches might constitute a "professional relationship."
>
> Our reading of subsection (i) is buttressed by the language of subsection (n), which explicitly provides that a charge of child seduction may be based on a person who "has or *had*" a professional relationship. I.C. § 35-42-4-7 (emphasis supplied). The 2013 amendment to the child seduction statute did not criminalize Benner's prior professional relationship with P.A. Rather, subsection (n) criminalized sexual conduct with a child between the ages of sixteen and eighteen occurring on or after July 1, 2013 if the person "has or had" a professional relationship with the child. I.C. § 35-42-4-7. The statute clearly does not limit the criminal offense to a person who is currently in a professional relationship.

*Benner*, No. 71A03-1607-CR-1609, slip op. at 3 (footnote omitted). Thus, we neither need to nor can we address it here.

[16] We turn now to the issue in the current case. In order to obtain convictions for child seduction in this case, the State must have proved beyond a reasonable doubt that (1) Benner (2) has or had a professional relationship (3) with P.A., a child of at least sixteen but less than eighteen years of age, (4) whom Benner knew was at least sixteen but less than eighteen years of age (5) when he used or exerted his professional relationship (6a) to engage in fondling or touching with P.A. and (6b) to engage in sexual intercourse or deviate sexual conduct with P.A. (7) with the intent to arouse or satisfy the sexual desires of P.A. or himself. *See* Appellant's App. Confidential Vol. 2, p. 2; Ind. Code § 35-42-4-7(n). Benner challenges the State's evidence as to his use or exertion of his professional relationship with P.A. to engage in these acts.

[17] In determining whether Benner used or exerted his professional relationship with P.A. to engage in sexual intercourse, deviate sexual conduct, and fondling or touching with the intent to arouse or satisfy the sexual desires of P.A. or himself, the jury could consider any of the following: (1) the age difference between Benner and P.A., (2) whether Benner was in a position of trust with respect to P.A., (3) whether Benner's conduct with P.A. violated any ethical obligations of Benner's profession or occupation, (4) the authority that Benner had over P.A., (5) whether Benner exploited any particular vulnerability of P.A., and (6) any other evidence relevant to Benner's ability to exert undue influence over P.A. *See* Ind. Code § 35-42-4-7 (o).

[18] At trial, the State presented evidence that P.A. was seventeen when the sexual activity began between her and Benner. Benner's wife testified that Benner was

born in December 1969, which made him forty-three years old in the spring and summer of 2013—an age difference of twenty-six years. It appears from the evidence that Benner began coaching P.A. from the time she was in the eighth grade and was well aware of her age.

[19] From the beginning, Benner was in a position of trust with P.A., both as her basketball coach and a family friend. This early foundation of a trusting relationship was a springboard from which Benner was able to increase the level of trust in order to secure unsupervised contact with P.A. to train her on a one-on-one basis. As a result, their relationship and trust continued to grow and become even stronger. Additionally, although at the time the sexual conduct occurred Benner was no longer P.A.'s official coach, P.A. and her family still trusted him to train her in preparation for her to obtain a college basketball scholarship.

[20] With regard to any violation of ethical obligations, the jury heard evidence that, during the time Benner was coaching P.A., Kevin Gradeless, the girls varsity coach, became aware of texts between Benner and P.A. that caused him concern. He alerted the administration at the high school, and the school administration investigated the issue. While it does not appear that the school system prohibited coaches texting their team members, the high school principal testified that it is "not something we would like to see our coaches do, especially if they're male to female athlete." Tr. Vol. 2, p. 82. School officials met with Benner and P.A., and no formal action was taken at the time.

[21] Next, we turn to the authority Benner had over P.A. It is undisputed that at the time the one-on-one workouts began, Benner had coaching authority over P.A. In addition, the State presented evidence that P.A. highly respected Benner's coaching authority. She admitted that she looked up to her coaches, listened to them, and followed their instructions and guidance. Considering their relationship, Benner was in a position to influence and subsequently persuade P.A. to continue the one-on-one training sessions with him even after he submitted his resignation to the school.

[22] The final two statutory factors concerning Benner's exploitation of particular vulnerabilities of P.A. and Benner's ability to exert undue influence over P.A. lend themselves to being examined in tandem. The State's overwhelming evidence showed that Benner was well aware of P.A.'s intense desire and motivation to improve her basketball skills. He was specifically aware of P.A.'s aspiration and the rigorous work ethic she employed in an effort to obtain a college scholarship to play basketball. This lofty goal made any extra coaching and instruction on a one-on-one basis invaluable to P.A. to the degree that she was willing to be trained by Benner on an individual basis.

[23] The extra individual training allowed Benner to be alone with P.A. for extended periods of time, which enabled him to capitalize on this relationship, thus fostering a deeper personal connection between them. Indeed, Benner admitted that he "knew P.A.'s emotions pretty well" from working with her and that she "was very emotional" and "sentimental." Tr. Vol. 3, pp. 45-46. In addition, Gradeless acknowledged at trial that Benner and P.A. had a close

relationship and that it was much closer than Benner had with other players on the team, and that, in his opinion, the relationship between Benner and P.A. was more than it should have been between coach and player. He also testified that Benner gave more individual attention to P.A. than he did other players. Further, even before he told the rest of the team, Benner went to P.A.'s home to privately inform her of his resignation as assistant coach, and it was then that he kissed P.A.

[24] Considering the totality of the facts and circumstances, the evidence firmly establishes Benner's use of his professional coach-player relationship with P.A. as a conduit for establishing a sexual relationship with her.

# Conclusion

[25] For the reasons stated, we conclude the State presented sufficient evidence to establish Benner used or exerted his professional relationship to engage in sexual conduct with P.A.

[26] Affirmed.

Kirsch, J., and Altice, J., concur.